UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CASE NO.: 3:06CV-151-R

DR. BRUCE TYLER                                                    PLAINTIFF

v.

UNIVERSITY OF LOUISVILLE, et. al.                                 DEFENDANTS

## MEMORANDUM OPINION

This matter is before the Court upon the Defendants' Motion for Summary Judgment
(Docket #73).  The Plaintiff responded (Docket #86) and the Defendants replied (Docket #92).
This matter is ripe for adjudication.  For the following reasons, the Defendants' Motion is
**GRANTED.**   The Plaintiff's claim for injunctive relief is **DISMISSED**.

## BACKGROUND

Dr. Tyler was hired by the University of Louisville ("University") in 1985, joining its
History Department as an assistant professor.  In 1991, Dr. Tyler was promoted to Associate
Professor, and in 1992 he received tenure.  Dr. Tyler was the first African-American tenured
professor in the History Department at the University.

In 1992, Dr. Tyler began to engage the History Department to address what he perceived
as institutional segregation within the University.  His actions included complaints and criticism
of Dr. Thomas Mackey ("Dr. Mackey"), who was Chairman of the History Department at that
time.  Dr. Tyler claims that these critiques influenced Dr. Mackey and other members of the
History Department to treat him differently when they were considering his proposed promotion
from an Associate Professor to a Full Professor.

In June 2003, Dr. Tyler filed a racial discrimination complaint against the University, Dr.

Mackey, and others within the University with the Equal Employment Opportunity Commission ("EEOC").  Dr. Tyler contends that his filing of the EEOC complaint also contributed to his unfair treatment during the promotion process.

In 2004, Dr. Tyler began the process of applying to become a full professor within the History Department.  A promotion to full professor is governed by the Redbook, the University's governing document, the College of Arts and Sciences (A&S) Personnel Policy, and the Dean's Guidelines for Pretenure, Tenure, and Promotion Reviews which accompany the A&S Personnel Policy.  The A&S Personnel Policy states, in Section 1.3(D), that for promotion in rank to full professor, the faculty candidate "shall show evidence of having attained proficiency in teaching, research and creative activity, and service and of superior achievement and recognition in at least one area, and shall give promise of continuing performance at or above such levels."

The Dean's Guidelines reiterate that candidates for promotion will be reviewed in the three primary areas of Teaching, Research and Creative Activity, and Service and goes into depth explaining what those areas constitute, the type of evidence that may be considered, and how to assess each area.  The Dean's Guidelines also outline the stages of promotion review, which are, in order of review: (1) review by a three-person unit personnel committee, (2) the unit faculty review, (3) review by the unit chair, (4) review by the Arts and Sciences Personnel Committee, and (5) review by the Dean of the College of Arts and Sciences, who must write a letter of recommendation to the Provost.

On November 3, 2004, the Department of History Personnel Committee (HPC) which consisted of Co-Defendants Dr. Tracy K'Meyer ("Dr. K'Meyer"), Dr. Ann Allen ("Dr. Allen"), and Dr. Bruce Adams ("Dr. Adams"), recommended against Dr. Tyler's promotion.  The HPC's

2

letter of recommendation outlines its findings regarding Dr. Tyler's achievements in the three areas of Teaching, Research and Creative Activity, and Service, rating his performance in all three areas as "proficient."  Without a "superior" rating in any area, the HPC recommended against promotion.

On November 4, 2004, Dr. Tyler submitted a lengthy rebuttal to the HPC recommendation, accusing the HPC of misconstruing the facts of his record, abusing the promotion process, and recommending against his promotion as a way to personally attack him due to longstanding tensions between himself and the History Department.

After the HPC's recommendation, the History Department faculty voted on the promotion, with twelve members voting against promotion, five voting for promotion, and two abstaining.  Once the History Department made its recommendation, on November 29, 2004, Dr. McLeod, the Chair of the History Department, conducted his review of Dr. Tyler's file and also recommended against the Plaintiff's promotion.  Dr. McLeod noted that Dr. Tyler's case was unusually complicated, and was not helped by his confusing curriculum vitae.  Dr. McLeod stated that there seemed to be some evidence that Dr. Tyler had been treated unfairly in his annual merit evaluations, but that was an entirely separate matter from whether he had earned promotion to full professor.  Dr. McLeod noted misrepresentations made by Dr. Tyler in his rebuttal to the HPC's recommendation and by the HPC in evaluation one of Dr. Tyler's unpublished manuscripts.  Dr. McLeod also uncovered various factual inaccuracies in the HPC's portrayal of Dr. Tyler's record.

Dr. McLeod concluded, however, in conducting his own separate evaluation of each of the three areas of Teaching, Research and Creative Activity, and Service, that none of these

complications, discrepancies, or inaccuracies warranted overturning the History Department's decision that Dr. Tyler had not achieved a "superior" rating in any of the areas.  Dr. McLeod stated that given the clear majority voting against promotion, he could not overturn the History Department's verdict.

On December 3, 2004, Dr. Tyler issued a rebuttal to Dr. McLeod's recommendation.  In this rebuttal, for the most part, he recounted the findings made during his 1992 tenure process and correlated them to the HPC's findings and recommendation.

Next, the Arts and Sciences Personnel Committee (A&SPC) met and reviewed Dr. Tyler's application.  In its recommendation issue December 13, 2004, the committee voted unanimously to recommend the promotion, assigning Dr. Tyler a "superior" rating in the area of Service.  In doing so, it noted that it believed Dr. Tyler's book Images of African American Life in Louisville, a collection of titled photographs, which was evaluated by the HPC in the Research and Creative Activity category, should have been evaluated in the Service category. The A&SPC stated that through the book. Dr. Tyler "made significant service contributions through providing a rich and detailed visual history of the African American community in Louisville and making that history available through a variety of venues."  The A&SPC thus concluded that Dr. Tyler deserved a superior rating in the Service area, warranting his promotion to full professor.

On January 14, 2005, Dean Blaine Hudson issued his recommendation against promotion and forwarded it to University Provost Shirley Willihnganz.  Dean Hudson noted that while "all reviewers agree that Professor Tyler is a competent historian with a proficient record of teaching and scholarship," there were disagreements about whether his service was proficient or superior.

4

Dean Hudson reasoned that the A&SPC  had erroneously reassigned  Images of African American Life in Louisville, to the Service category, which was designated as professional activity by both the College of Arts and Sciences and Dr. Tyler.  Dean Hudson also stated that the A&SPC augmented Dr. Tyler's record by counting activities that occurred prior to 1991 when Dr. Tyler was promoted to associated professor with tenure.  Thus, Dean Hudson concluded that he found Dr. Tyler only proficient in all three areas, and recommended against his promotion.

On January 20, 2005, Dr. Tyler issued a rebuttal to Dean Hudson's recommendation.  Dr. Tyler objected to Dean Hudson's failure to discuss his entire record in his recommendation, to Dean Hudson's allusion that the A&SPC's decision to recommend promotion was "compensatory," and to Dean Hudson's objection to the "reassignment" of the book to the service category.  Dr. Tyler alleged that the guidelines allowed for works to cross categories, which the A&SPC noted in considering the book in the Service category.

Provost Shirley Willihnganz accepted Dean Hudson's recommendation, and on April 18, 2005, Dean Hudson notified Dr. Tyler of the Provost's decision by letter.  On April 19, 2005, Dr. Tyler sent a final "rebuttal" to Dean Hudson, insisting that his case go to the University President Dr. James Ramsey and to the Board of Trustees for a full evaluation.  In that rebuttal, he stated that he believed he was denied promotion to protect the former Chair of the History Department, Dr. Mackey, against whom he had filed a racial discrimination complaint in 2003.

On January 17, 2006, the EEOC issued Dr. Tyler a right to sue letter, and Dr. Tyler filed his original pro se complaint in this Court on March 20, 2006, against the University, the History Department, and ten University employees.  The complaint has been amended such that there are

now twenty-seven individual Defendants, in addition to the University and the History Department.

After two Orders of dismissal issued by this Court, Dr. Tyler has three claims remaining against the Defendants.  The remaining counts are: (1) a claim for injunctive relief against the Defendants in their official capacities pursuant to 42 U.S.C. § 1983; (2) Title VII and Kentucky Civil Rights Act claims against the University of Louisville for discrimination, retaliation and condoning and/or creating a hostile work environment; and (4) claims against the Defendants in their individual capacities under 42 U.S.C. §§ 1983 and 1985(3).

## STANDARD

Summary judgment is available under Fed. R. Civ. P. 56(c) if the moving party can establish that the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case.  *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff.  *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

6

251-52 (1986)).  Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

### 1.  Dr. Tyler's claim for injunctive relief against the Defendants in their official capacities pursuant to 42 U.S.C. § 1983

As the Court stated in its November 27, 2006, Memorandum Opinion, the United States Supreme Court has held that a state official may be sued in his or her official capacity for injunctive relief.  *Will v. Michigan Dept. Of State Police*, 491 U.S. 58, 71 n.10 (1989).  Dr. Tyler included a claim for injunctive relief pursuant to 42 U.S.C. § 1983 in Count VIII of his Amended and Substituted Complaint, and the Court allowed his claim for injunctive relief against the Defendants in their official capacities to go forward at that time.

In Count VIII, Dr. Tyler states that he expects the Defendants to terminate his employment or continue to deny him promotion.  He asks the Court to find that the Redbook constitutes a contract and that the Defendants must adhere to its terms and conditions.  He also asks the Court enjoin the Defendants from taking any disciplinary action against him until he has been accorded a fair and complete opportunity to acquire full professorship.  Dr. Tyler further states in the complaint that he also desires a permanent injunction prohibiting the Defendants from interrupting the promotion process in the future and mandating that the process must proceed in accordance with the applicable sections of the Redbook.

The Court does not need to assess whether it should exercise its discretion to grant the

7

preliminary injunction Dr. Tyler seeks in his complaint.  The Court noted in its November 2006, Memorandum Opinion that the Plaintiff had not filed a motion under Fed. R. Civ. P. 52 seeking injunctive relief under 42 U.S.C. § 1983 and thus could not render a decision on the merits of dismissing the claims for injunctive relief.  The Defendants now argue that the Plaintiff still has not filed such a motion and the claim for injunctive relief should therefore be dismissed.  In his response, the Plaintiff agrees with the Defendants and states that his claim for injunctive relief as contained in Count VIII of the Amended and Substituted Complaint is premature.

Therefore, it appears to the Court that the Plaintiff wishes to no longer maintain his claim for injunctive relief.  The Court will treat the Plaintiff's concession as a voluntary dismissal of his claim for injunctive relief.  Thus, Dr. Tyler's claim for injunctive relief against the Defendants in their official capacities under 42 U.S.C. § 1983 is **DISMISSED**.

## 2.  Dr. Tyler's Title VII and Kentucky Civil Rights Act Claims Against the University

### A.  Disparate Treatment Claim Under Title VII and KRS 344.040

The burdens of proof in federal Title VII race discrimination in employment cases were first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later clarified by *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 ( 1981).  The same burdens of proof apply to race discrimination claims brought under the Kentucky Civil Rights Act, KRS 344.010 *et seq* (KCRA), because the KCRA is modeled upon Title VII of the Civil Rights Act of 1964. Claims of race discrimination brought pursuant to KRS 344.040 "should be interpreted consonant with federal interpretation" of Title VII claims.  *Meyers v. Chapman Printing Co.*, 840 S.W.2d 814, 821 (Ky. 1992).

There are three stages of proof in Title VII cases.  *Kline v. TVA*, 128 F.3d 337, 342 (6th

Cir. 1997).  "First, the plaintiff must prove a prima facie case of discrimination."  *Id.* (citing *Burdine*, 450 U.S. at 252-53 (citing *McDonnell Douglas*, 411 U.S. at 802 (1973))).  If the plaintiff establishes a "prima facie case, the burden shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Id.*  (quoting *Burdine*, 450 U.S. at 253 (quoting *McDonnell Douglas*, 411 U.S. at 804)).  "If the defendant carries this burden, the plaintiff must prove that the proffered reasons were pretextual."  *Id.*  (quoting *Burdine*, 450 U.S. at 253 (quoting *McDonnell Douglas*, 411 U.S. at 804)).  The plaintiff establishes pretext "by a direct showing that a discriminatory reason more likely motivated the employer or by an indirect showing that the employer's explanation is not credible."  *Id.* at 342-43 (citing *Burdine*, 450 U.S. at 256).

"A plaintiff may establish a prima facie case of discrimination either by presenting direct evidence of intentional discrimination by the defendant, or by showing the existence of circumstantial evidence which creates an inference of discrimination."  *Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241, 1246 (6th Cir. 1995) (internal citations omitted).  The parties here agree that the Plaintiff's claims of alleged discrimination are based on indirect evidence.  Under the indirect approach, Dr. Tyler must show "(1) that he is a member of a protected group, (2) that he was subject to an adverse employment decision, (3) that he was qualified for the position, and (4) that he was replaced by a person outside of the protected class..." or "...that similarly situated non-protected employees were treated more favorably."  *Id.*

The Defendants do not deny that Dr. Tyler is a member of a protected class, or that he was subject to an adverse employment decision.  However, the Defendants contend that Dr. Tyler cannot establish a prima facie case because he was not qualified for the promotion to full

9

professor and cannot show he was treated differently than a similarly-situated non-protected employee.

Even assuming *arguendo* that Dr. Tyler may be able to prove that he was qualified for the promotion to full professor at the time he applied for the position, the Court finds that he cannot prove that he was replaced by a person outside of the protected class or that similarly situated non-protected employees were treated more favorably. *Talley*, 61 F.2d at 1246. The Plaintiff initiated the promotion process on his own; he was not removed from his position and replaced by a person outside his protected class. Therefore, he cannot meet the first alternative in part four of the prima facie case test.

In order for two or more employees to be considered "similarly-situated," the Plaintiff "must prove that all of the relevant aspects of his employment situation are 'nearly identical' to those of the [non-protected] employees who he alleges were treated more favorably. The similarity between the compared employees must exist in all relevant aspects of their respective employment circumstances." *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994). As to what constitutes "all relevant aspects," the Sixth Circuit has said that courts "should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Ercegovich v. Goodyear Tire & Rubber* Co., 154 F.3d 344, 352 (6th Cir. 1998).

Dr. Tyler cannot establish a prima facie case of discrimination because he has provided no evidence that he was treated less favorably than a similarly situated individual outside his protected class. Dr. Tyler has recounted the promotions processes of Dr. Theriot and Dr. Harrison as evidence that similarly-situated persons outside his class were treated more

10

favorably.  However, Drs. Theriot and Harrison were not "similarly situated" to Dr. Tyler.

Both Dr. Theriot and Dr. Harrison were promoted to full professors at a time when Dr. Tyler was a member of the History Department, serving as an associate professor.  However, the promotion processes of Harrison and Theriot took place in 1997 and 1998, respectively, and Dr. Tyler did not submit an application for promotion until 2004.  Thus, these two professors were promoted *six to seven years before* Dr. Tyler even submitted his application.

The circumstances surrounding the promotions and the people associated with them were quite clearly different.  Drs. Theriot and Harrison were promoted under different deans and different chairs of the History Department and were promoted based on their performance in different areas.  It is impossible to say that all of the relevant aspects of Dr. Tyler's employment situation are 'nearly identical' to the employment aspects of these two professors, such that Dr. Tyler may be able to maintain a disparate treatment claim against the University.

For these reasons, the Defendants are entitled to summary judgment on Dr. Tyler's disparate treatment claim under Title VII and KRS 344.040.

**B. Retaliation Claim under Title VII and KRS 344.280**

The anti-retaliation provision of Title VII makes it unlawful for an employer to "discriminate against" an employee or job applicant because that individual opposed any practice made unlawful by Title VII or "made a charge, testified, assisted, or participated" in a Title VII proceeding or investigation.  42 U.S.C. § 2000e-3(a) (2007).

To establish a prima facie case of retaliation under Title VII, a plaintiff must establish that: (1) he engaged in an activity protected by Title VII; (2) the defendant knew he engaged in the protected activity; (3) the defendant subsequently took an employment action adverse to the

11

plaintiff; and (4) there exists a causal connection between the protected activity and the adverse employment action. *Abbott v. Crown Motor Co., Inc*., 348 F.3d 537, 542 (6th Cir. 2003) (citing *Strouss v. Michigan Dep't of Corr*., 250 F.3d 336, 342 (6th Cir. 2001); *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)).

The anti-retaliation provision only "protects an individual...from retaliation that produces an injury or harm," but the United States Supreme Court has recently held that "the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment,"or only those acts that occur at the workplace. *Burlington Northern & Santa Fe Ry. v. White*, 126 S. Ct. 2405, 2412-14 (2006).  In modifying the third element of the prima facie case, above, the Court held that a plaintiff "must show that a reasonable employee would have found the challenged action *materially adverse*," meaning "'it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 2415 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (internal quotations omitted)) (emphasis added).

Once the plaintiff establishes a prima facie case, the burden "shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action." *Abbott*, 348 F.3d at 542 (citing *Nguyen*, 229 F.3d at 562).  If the defendant meets that burden, "the plaintiff must then demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination by establishing that the proffered reason: 1) has no basis in fact; 2) did not actually motivate the adverse action; or 3) was insufficient to motivate the adverse action. *Id.* (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).  The burden of persuasion always remains with the plaintiff.  *Id.* (citing *St. Mary's Honor Ctr. v.*

12

*Hicks*, 509 U.S. 502, 511 (1993)).

The Plaintiff's presentation of his retaliation claim is somewhat disorganized.  In his Amended and Substituted Complaint,  Dr. Tyler claims the University did not promote him in retaliation for his complaints about the racial composition of the History Department and the EEOC complaint he filed in June 2003.  In his Third Amended Complaint, Dr. Tyler seems to assert that the Defendants have also retaliated against him for filing the instant suit, which was filed in this Court on March 30, 2006.  In his Third Amended Complaint, Dr. Tyler claims:

> (1) The Defendants retaliated against him on April 28, 2006, by instructing the Chairman of the History Department not to approve any of his academic pursuits, most recently his proposal for a Kentucky and Louisville Patriotic, Wartime Home Front and Community Pride Studies Program.

> (2) The Defendants retaliated against him on July 18, 2006, by denying his application for the African-American Faculty Professional Development Mini-Grant, which had been approved on two previous occasions.

### i.  Retaliation for actions prior to lawsuit

In 1992, Dr. Tyler began to engage the history department at the University to address what he perceived as institutional segregation within the University.  His actions included complaints and criticism of Dr. Mackey, who was Chairman of the History Department at that time.   In June 2003, Dr. Tyler filed a racial discrimination complaint against the University, Dr. Mackey, and others within the University with the EEOC.

In 2004, Dr. Tyler began the process of applying to become a full professor, ending with the submission of his final rebuttal to the denial of this proposed promotion in April 2005.  On November 4, 2004, the HPC recommended against the promotion and rated Dry. Tyler as only "proficient" in all three areas, which Dr. Tyler claims was in response to the EEOC complaint. When the History Department voted against recommending Dr. Tyler's promotion later that

13

same month, Dr. Mackey had been replaced as the Chairman of the History Department by Dr. McLeod.  It is not clear to the Court when exactly Dr. McLeod assumed the chair position.

By filing the EEOC complaint, Dr. Tyler engaged in an activity protected by Title VII, and the University was aware of that complaint.  Assuming for the sake of argument that the denial of Dr. Tyler's promotion was "materially adverse, " the Court finds that Dr. Tyler cannot establish that a causal connection existed between the EEOC complaint and the denial of his proposed promotion.

The burden of establishing a prima facie case in a retaliation claim "'is not onerous but one easily met.'"  *Abbott*, 348 F.3d at 542 (quoting *Nguyen*, 229 F.3d at 563).  In order to establish the required 'causal connection,' "a plaintiff is required to 'proffer evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action.'" *EEOC v. Avery Dennison Corp*., 104 F.3d 858, 861 (6th Cir. 1997) (quoting *Zanders v. National R.R. Passenger Corp*., 898 F.2d 1127, 1135 (6th Cir. 1990) (internal citation omitted)).

While the burden of establish a prima facie case is generally considered an easy one, the Plaintiff still has not presented any evidence tying his EEOC complaint to the denial of his promotion.  While Dr. Tyler may "feel" that his treatment is directly related to the complaint against Dr. Mackey, this is simply not enough to cross the prima facie hurdle.  Dr. Mackey was not the Chair of the History Department when the department voted against promotion.  Dr. Tylerhas produced no statements made by any of the Defendants or actions taken that suggest, even in the slightest degree, that the complaint may have triggered retaliation.

The Defendants argue that Dr. Tyler cannot establish a causal connection between any protected activity and the decision not to promote him because he was not promoted simply

because he did not meet the criteria for promotion.  Even if Dr. Tyler sincerely believes that his EEOC complaint caused the members of the History Department to vote against his promotion, the Court cannot allow his claim to proceed without any evidence of that connection.

### ii.  Retaliation for filing this lawsuit

The Court also finds that Dr. Tyler has not presented sufficient evidence tending to prove a causal connection between this lawsuit and the denials of his application for an African-American Faculty Professional Development Mini-grant and his proposal for the Patriotic, Wartime Home Front and Community Pride Studies Program.

From what the Court can discern based on the record, on July 18, 2006, the University's Diversity Work Group denied Dr. Tyler's application for the African-American Faculty Professional Development Mini-grant.  It appears that Dr. Tyler filed a Grievance Submission Form over the denial on September 12, 2006.  In his grievance, Dr. Tyler stated that he had been awarded the mini-grant in the two previous years for the same project, and the Diversity Work Group denied his application because they alleged that Dr. Tyler's desire to use the grant funds to purchase historical pictures from the University photographic archives and to publish the book Louisville in World War II was not the sort of usage for which the grant funds were intended. The Diversity Work Group also said his application was crude and "difficult to follow."  Dr. Tyler alleged the denial violated the University's Statement of Academic Freedom, violated the Redbook "on multiple levels," harmed his reputation, and was intended to retaliate against and punish him for his charges of racial bias.

The record also contains a letter to Dr. Tyler from Ed Redner, the Chair of the University Faculty Grievance Committee, dated October 23, 2006.  In that letter, Mr. Redner informs Dr.

15

Tyler that the Grievance Committee voted not to accept his grievance because (1) the denial of the mini-grant was within the discretion of the Dean of the College of Arts and Sciences and the Diversity Work Group; (2) the Committee did not think the denial fell within the criteria for a grievance as found in 4.4.2 of the Redbook; (3) the Committee did not see how the University's statement of Academic Freedom was implicated in the denial; and (4) the Committee did not see how promotion in rank was involved in the case.

Assuming, for the sake of argument, that Dr. Tyler could establish a prima facie case of retaliation from the University, on the basis of his grant denial, in response to this lawsuit, the burden would then shift to the Defendants to "articulate a legitimate, non-discriminatory reason" for the denial.  *Abbott*, 348 F.3d at 542.  The letter from Mr. Edner articulates the same reasoning advanced by Defendants: the Diversity Work Group had the discretion to grant or deny Mr. Tyler's application for the mini-grant, and in utilizing that discretion, determined that Mr. Tyler's proposal as written, simply did not meet the criteria for the grant funds, which is not grounds for a grievance.

With this proffered legitimate, non-discriminatory reason, Dr. Tyler must demonstrate, by a preponderance of the evidence, that this reason is mere pretext for discrimination by establishing that it "1) has no basis in fact; 2) did not actually motivate the adverse action; or 3) was insufficient to motivate the adverse action.  *Id.*  Dr. Tyler has not demonstrated either of these three possibilities.  The Grievance Committee's response to Dr. Tyler's grievance is reasoned and thorough.  It address each point of the contentions Dr. Tyler's raised in his grievance.

All Dr. Tyler has done in the face of this reasoned explanation is assert that the denial of

16

his mini-grant application was an act of retaliation.  Understandably, Dr. Tyler would not, and still does not, agree with the denial of his application for a grant he had previously received. However, Dr. Tyler has not offered any evidence that the Diversity Work Group and Grievance Committee's decision's have no basis in fact, did not actually motivate the denial of his application, or were insufficient to motivate the denial.  *See id*.  Dr. Tyler's belief that he was denied the grant in retaliation for filing the lawsuit, with any offer of proof, simply is not sufficient to connect his protected activity to the denial of the mini-grant.  He has not, and on th the basis of the available evidence cannot, establish that the Defendants' reason is "mere pretext for discrimination."  *Id.*

Dr. Tyler also seems to claim that an email from Dr. McLeod sent on April 28, 2006, is evidence that the Defendants were punishing him for the lawsuit.  The email appears to have been sent in response to Dr. Tyler's request that Dr. McLeod, the Chair of the History Department provide him with a letter of support for his Kentucky and Louisville Patriotic, Wartime Home Front and Community Pride Studies Program.  The Court strains to see how this email is evidence of retaliation.

In the email, Dr. McLeod declines to provide Dr. Tyler with a letter of support, and Dr. Tyler claims that Dr. McLeod failure to assist him is clear evidence of retaliation.  However, that is all Dr. Tyler does; he simply states that it is evidence of retaliation.

Dr. Tyler has produced no evidence that Dr. McLeod made the decision to deny his proposal for the program, that he assisted him in the past on such proposals, or that Dr. McLeod has any professional obligation to provide Dr. Tyler with such a recommendation.  Instead, the evidence as presented indicates that Dr. Tyler claims he was retaliated against because Dr.

17

McLeod declined to do Dr. Tyler a favor.  This simply is not evidence of a causal connection to satisfy Dr. Tyler's burden of proving a prima facie case.  *Avery Dennison*, 104 F.3d at 861.

For these reasons, the Defendants are entitled to summary judgment on Dr. Tyler's retaliation claim.

### C.  Hostile Work Environment Claim under Title VII and KRS Chapter 344

The Plaintiff has conceded that he cannot maintain a hostile work environment claim under Title VII and KRS Chapter 344.  Therefore, the Defendants are entitled to summary judgment on Dr. Tyler's hostile work environment claim.

### 3.  Dr. Tyler's claims against the Defendants in their individual capacities under 42 U.S.C. §§ 1983 and 1985(3)

### A.  § 1983 Equal Protection Clause claim

For a plaintiff to assert a claim under 42 U.S.C. §1983, "a plaintiff must allege the deprivation of a constitutional right caused by a person acting under [the] color of state law." *Bell v. Ohio State University*, 351 F.3d 240, 248 (6th Cir. 2003) (*citing Black v. Barberton Citizens Hosp.*, 134 F.3d 1265, 1267 (6th Cir. 1998)).  In particular, the plaintiff must state a claim that the defendant violated his/her procedural or substantive due process rights under the Fourteenth Amendment or an equal protection clause claim under the Fourteenth Amendment. *Id*. at 248-52.  This Court has previously dismissed Dr. Tyler's procedural and substantive due process claims, leaving Dr. Tyler with a §1983 equal protection clause claim.  Dr. Tyler contends that the Defendants violated his Fourteenth Amendment right to equal protection because they denied his promotion to full professor based on his race.

Section 1983, like Title VII of the Civil Rights Act of 1964, under which Dr. Tyler also had a claim, "provides relief for discriminatory employment practices of public employers."

18

*Kitchen v. Chippewa Valley Schools*, 825 F.2d 1004, 1011 (6th Cir. 1987) (citing *Daniels v. Board of Educ.*, 805 F.2d 203, 207 (6th Cir. 1986)).  "Disparate treatment claims brought under either statute require proof of purposeful discrimination."  *Id*.

The elements of an equal protection claim are the same as those discussed above in Section 2(A) for Dr. Tyler's Title VII and Kentucky Civil Rights act discrimination in employment claims.  *See id.*  The shifting evidentiary burdens set out in McDonnell Douglas and Burdine are applicable to § 1983 cases.  *Id.*  As the Court has found that Dr. Tyler cannot meet the evidentiary burden for his Title VII and Kentucky Civil Rights Act claims, he similarly cannot meet the evidentiary burden for his §1983 equal protection claim.

Further, when a §1983 plaintiff states a claim under the equal protection clause, the plaintiff must prove by "requisite direct, circumstantial, or statistical evidence that he was the target of racial profiling."  *United States v. Saucedo*, 226 F.3d 782, 790 (6th Cir. 2000).  This burden requires more than speculation.  *Id.* at 790.  In addition, the plaintiff must allege that the state actor intentionally discriminated against him because he was a member of a protected class. *LRL Properties v. Portage Metro Housing Authority*, 55 F.3d 1097, 1111 (6th Cir. 1995) (citing *Henry v. Metropolitan Sewer Dist.*, 922 F.3d 332, 341 (6th Cir. 1990)).

Dr. Tyler argues that based upon the evidence, "the only logical explanation" for the denial of his application for promotion is his race.  However, "the only logical explanation" does not meet the §1983 requirements, as Dr. Tyler's theory is not any more than speculation. *Saucedo*, 226 F.3d at 790.  To meet his burden, Dr. Tyler must allege specific incidents or specific racial intent related to this particular matter, or actions or statements made by the Defendants, which show that the activities in question were racially motivated in violation of the

19

Equal Protection Clause.  The Plaintiff has made no such showing.

While Dr. Tyler may argue that his promotion process was flawed, which, according to Dr. McLeod it may have been, he has not pointed to a single piece of evidence to support his claim that this flawed process was a result of intentional racial discrimination on the part of the members of the University that participated in the promotion process.  Therefore, the Defendants are entitled to summary judgment on Dr. Tyler's § 1983 equal protection claim.

**B.  Conspiracy Under § 1985(3)**

The Sixth Circuit has held that in order to establish a claim for conspiracy under civil rights statute 42 U.S.C. § 1985(3), the plaintiff must prove: (1) conspiracy involving two or more persons; (2) a deprivation, directly or indirectly, affecting a person or class of persons entitled to equal protection of the laws; (3) an act in furtherance of conspiracy; and (4) such act causes injury to person or property, or deprivation of any right or privilege of a citizen of the United States.  *Johnson v. Hills & Dales General Hospital,* 40 F.3d 837, 839 (6th Cir. 1994).  A § 1985(3) plaintiff "must also establish that the conspiracy was motivated by a class-based animus."  *Id*.

The facts, examined in a light most favorable to the Plaintiff, do not amount to a claim of civil rights conspiracy under 42 U.S.C. §1985(3).  The Plaintiff has not pointed to any evidence that tends to prove even the first factor, a conspiracy involving two or more persons.  In his response to the motion for summary judgment, the Plaintiff makes vague allusions to three of the Defendants, Dr. Mackey, former chair of the History Department, Dr. John McLeod, chair of the History Deparment, and Dr. Bruce Adams, a member of the HPC which recommended against Dr. Tyler's promotion in February 2004.  However, the Plaintiff has not even attempted to argue

20

that these three Defendants, or any others, acted in concert or in furtherance of a common objective.  He has not connected them in any way.

Dr. Tyler has failed to present any evidence supporting his allegation that the Defendants conspired to deprive him of their constitutional rights, and the Court finds that summary judgment in favor of the Defendants is warranted with respect to this claim.

In the end, it appears that the University could have processed Dr. Tyler's application to become a full professor in a better manner.  However, the Court finds there is not sufficient evidence of discrimination, retaliation, a hostile work environment, or any constitutional violation to allow the case to proceed.

## CONCLUSION

For the foregoing reasons, the Plaintiff's claim for injunctive relief against the Defendants in their official capacities pursuant to 42 U.S.C. § 1983 is **DISMISSED**.  The Defendants' Motion for Summary Judgment is **GRANTED** as to the Plaintiff's Title VII and Kentucky Civil Rights Act claims against the University of Louisville for discrimination, retaliation and condoning and/or creating a hostile work environment and as to the Plaintiff's claims against the Defendants in their individual capacities under 42 U.S.C. §§ 1983 and 1985(3).

An appropriate order shall issue.

21