UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CASE NO.: 3:06-CV-151-R

DR. BRUCE M. TYLER                                                                                    PLAINTIFF

v.

UNIVERSITY OF LOUISVILLE, et. al.                                                          DEFENDANTS

**OPINION AND ORDER**

This matter is before the Court upon Plaintiff's Motion to Alter, Amend, and Vacate (Docket #98). Defendant has responded (Docket #99). Plaintiff has failed to reply. This matter is now ripe for adjudication. For the following reasons, Plaintiff's Motion to Alter, Amend, and Vacate is **DENIED**.

**BACKGROUND**

Dr. Bruce M. Tyler was hired by the University of Louisville ("University") in 1985 as an assistant professor in the History Department. In 1991, Dr. Tyler was promoted to Associate Professor. In 1992, he received tenure. Dr. Tyler was the first African-American tenured professor in the History Department at the University.

Beginning in 1992, Dr. Tyler approached the History Department about what he perceived to be an institutional segregation within the University. His actions included complaints and criticism of Dr. Thomas Mackey, who was then Chairman of the History Department. Dr. Tyler claims that these critiques influenced Dr. Mackey and other members of the History Department to treat him differently when they considered his proposed promotion from associate professor to full professor in 2004.

Earlier in June 2003, Dr. Tyler had filed a racial discrimination complaint against the

University, Dr. Mackey, and others University employees with the Equal Employment Opportunity Commission ("EEOC"). Dr. Tyler contends that his filing of the EEOC complaint also contributed to his unfair treatment during the promotion process.

In 2004, Dr. Tyler began the process of applying to become a full professor. A promotion to full professor is governed by several University policies: (1) the Redbook, the University's governing document; (2) the College of Arts and Sciences ("A&S") Personnel Policy; and (3) the Dean's Guidelines for Pretenure, Tenure, and Promotion Reviews, which accompany the A&S Personnel Policy. The A&S Personnel Policy states that in order to be promoted to full professor, the faculty candidate must show evidence of proficiency in the three areas of Teaching, Research & Creative Activity, and Service, and superior achievement in at least one of these three areas.

On November 3, 2004, the Department of History Personnel Committee ("HPC"), which consisted of Co-Defendants Dr. Tracy K'Meyer, Dr. Ann Allen, and Dr. Bruce Adams, recommended against Dr. Tyler's promotion. The HPC found that while Dr. Tyler's achievements in the areas of Teaching, Research & Creative Activity, and Service were all "proficient," Dr. Tyler was not "superior" in any area. The following day, Dr. Tyler submitted a lengthy rebuttal to the HPC recommendation, accusing the HPC of misconstruing the facts of his record, abusing the promotion process, and recommending against his promotion to personally attack him based on longstanding tensions between himself and the History Department.

After the HPC's recommendation, the entire History Department faculty voted on the promotion. Twelve faculty members voted against promotion, five voted for promotion, and two abstained. Once the History Department made its recommendation, Dr. McLeod, the current

Chair of the History Department, conducted his own review of Dr. Tyler's file. He also recommended against Dr. Tyler's promotion. Dr. McLeod stated that there seemed to be some evidence that Dr. Tyler had been treated unfairly in his annual merit evaluations, but that was an entirely separate matter from whether he had earned promotion to full professor. Dr. McLeod concluded that given that the majority of faculty voted against his promotion, he could not overturn the History Department's verdict. Dr. Tyler issued a rebuttal to Dr. McLeod's recommendation.

Next, the Arts and Sciences Personnel Committee ("A&SPC") met and reviewed Dr. Tyler's application. In its recommendation issued on December 13, 2004, the committee voted unanimously to recommend Dr. Tyler's promotion to full professor. In doing so, the A&SPC assigned Dr. Tyler's achievements in the area of Service as "superior."

On January 14, 2005, Dean Blaine Hudson issued his recommendation against Dr. Tyler's promotion and forwarded it to University Provost Shirley Willihnganz. Dean Hudson noted that while "all reviewers agree that Professor Tyler is a competent historian with a proficient record of teaching and scholarship," there were disagreements about whether his service was proficient or superior. On January 20, 2005, Dr. Tyler issued a rebuttal to Dean Hudson's recommendation.

Provost Shirley Willihnganz accepted Dean Hudson's recommendation, and on April 18, 2005, Dean Hudson notified Dr. Tyler of the Provost's decision by letter. On April 19, 2005, Dr. Tyler sent a final "rebuttal" to Dean Hudson, insisting that his case go to the University President, Dr. James Ramsey, and to the Board of Trustees for a full evaluation. In that rebuttal, Dr. Tyler stated that he believed he was denied promotion to protect the former Chair of the

History Department, Dr. Mackey, against whom he had filed a racial discrimination complaint in 2003.

On January 17, 2006, the EEOC issued Dr. Tyler a right to sue letter. Dr. Tyler filed his original pro se complaint with the Court on March 20, 2006, against the University, the History Department, and ten University employees. His complaint was later amended to include twenty-seven individual Defendants, in addition to the University and the History Department. Following two Orders of dismissal issued by the Court, Dr. Tyler proceeded on three remaining claims.

In its Feburary 27, 2008 Order, the Court addressed Dr. Tyler's three claims: (1) a claim for injunctive relief against Defendants in their official capacities pursuant to 42 U.S.C. §1983; (2) Title VII and Kentucky Civil Rights Act claims against the University for discrimination, retaliation, and condoning and/or creating a hostile work environment; and (3) claims against Defendants in their individual capacities under 42 U.S.C. §§1983 and 1985(3). The Court dismissed Dr. Tyler's claim for injunctive relief and granted summary judgment in favor of Defendants on Dr. Tyler's two remaining claims. Dr. Tyler now moves to alter, amend, and vacate the Court's February 2008 Order.

## STANDARD

A court may grant a motion to alter or amend, pursuant to Federal Rule of Civil Procedure 59(e), "if there is a clear error of law, newly discovered evidence, an intervening change in controlling law or to prevent manifest injustice." *GenCorp v. Am. Int'l*, 178 F.3d 804, 834 (6th Cir.1999) (internal citations omitted). "[C]ourts typically will consider additional evidence accompanying a Rule 59(e) motion only when it has been newly discovered, and that to

4

[c]onstitute 'newly discovered evidence,' the evidence must have been previously unavailable." *Id.* A Rule 59(e) motion to alter does not provide a plaintiff with another opportunity to argue the merits of his case. *Id.*

## DISCUSSION

Dr. Tyler's memorandum in support of his Motion to Alter, Amend, and Vacate only addresses Dr. Tyler's claims against the University under Title VII and the Kentucky Civil Rights Act. It does not address Dr. Tyler's claim for injunctive relief nor his claims against Defendants in their individual capacities under 42 U.S.C. §§1983 and 1985(3). Therefore, the Court will now only consider Dr. Tyler's Title VII and Kentucky Civil Rights Act claims.

At the outset, the Court notes that the Kentucky Civil Rights Act, KRS 344.010 *et seq* ("KCRA"), is modeled after Title VII. *Meyers v. Chapman Printing Co.*, 840 S.W.2d 814, 821 (Ky. 1992). Therefore, the Court applies the same burden of proof when assessing both claims. *Id.*

There are three stages of proof in Title VII cases. *Kline v. TVA*, 128 F.3d 337, 342 (6th Cir. 1997). "First, the plaintiff must prove a prima facie case of discrimination." *Id.* (citing *Burdine*, 450 U.S. at 252-53 (citing *McDonnell Douglas*, 411 U.S. at 802 (1973))). Second, if the plaintiff establishes a prima facie case of discrimination, then "the burden shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Id.* (quoting *Burdine*, 450 U.S. at 253 (quoting *McDonnell Douglas*, 411 U.S. at 804)). Third, if the defendant satisfies his burden, then "the plaintiff must prove that the proffered reasons were pretextual." *Id.* (quoting *Burdine*, 450 U.S. at 253 (quoting *McDonnell Douglas*, 411 U.S. at 804)). The plaintiff establishes pretext "by a direct showing that a

discriminatory reason more likely motivated the employer or by an indirect showing that the employer's explanation is not credible." *Id.* at 342-43 (citing *Burdine*, 450 U.S. at 256).

Regarding the first stage of proof, a plaintiff may establish a prima facie case of discrimination in one of two ways: "either by presenting direct evidence of intentional discrimination by the defendant, or by showing the existence of circumstantial evidence which creates an inference of discrimination." *Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241, 1246 (6th Cir. 1995) (internal citations omitted). The parties agree that Dr. Tyler's claims of alleged discrimination are based on indirect evidence. Under the indirect approach, Dr. Tyler must show "(1) that he is a member of a protected group, (2) that he was subject to an adverse employment decision, (3) that he was qualified for the position, and (4) that he was replaced by a person outside of the protected class..." or "...that similarly situated non-protected employees were treated more favorably." *Id.*

The Court's February 2008 Order held, and the parties do not now dispute, that Dr. Tyler is a member of a protected class and that he was subject to an adverse employment decision. While the third and fourth criteria of the indirect approach were originally disputed by the parties, Dr. Tyler's present motion focuses exclusively on the fourth criteria - whether Dr. Tyler was replaced by a person outside of the protected class or that similarly situated non-protected employees were treated more favorably.

Dr. Tyler was not replaced by a person outside of his protected class. Dr. Tyler was not competing with another professor for his promotion to full professor, nor was he removed from his current position as associate professor. In regard to the standard under Rule 59(e), Dr. Tyler offers no newly discovered evidence, nor does he argue that an intervening change in the law is

controlling. Therefore, all that remains for the Court to determine is whether a clear error of law or manifest injustice was committed regarding Dr. Tyler's comparison to similarly situated non-protected employees.

Citing *Ercegovich v. Goodyear Tire & Rubber* Co., Dr. Tyler contends that the Court applied too rigid and inflexible an application of the *McDonnell Douglas* paradigm in making its determination that the circumstances surrounding the promotions of Dr. Theriot and Dr. Harrison were not "similarly situated" to that of Dr. Tyler's promotion process. *Ercegovich* involved a plaintiff's claim of unlawful age discrimination. 154 F.3d 344 (6th Cir. 1998). In its determination of whether the plaintiff could prove that a similarly situated employee outside the protected class received more favorable treatment, the Sixth Circuit explained that "the plaintiff was simply 'required to prove that all of the relevant aspects of his employment situation were "nearly identical" to those of [the non-minority's] employment situation.'" 153 F.3d at 352 (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796 (6th Cir.1994)). The court should make an "independent determination" as to the relevancy of the plaintiff's employment status as compared to that of the non-protected employee. *Id.* "The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated;' rather, as this court has held in *Pierce*, the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects.'" *Id.* (citing *Pierce*, 40 F.3d at 802 (emphasis added)). Ultimately, the court in *Ercegovich* concluded the plaintiff's position was similarly situated to other non-protected employees in that they all shared human resource positions, even though none of their job functions were similar. *Id.* at 353.

In its February 2008 Order, the Court considered it relevant that the promotion processes of Dr. Theriot and Dr. Harrison occurred in 1998 and 1997, respectively, while Dr. Tyler's did not occur until 2004. The Court found it significant that these two professors were promoted six to seven years before Dr. Tyler submitted his application and that the circumstances surrounding their promotions were quite different. Dr. Theriot and Dr. Harrison were promoted under different deans and different chairs of the History Department and were promoted based on their performance in different areas.

Dr. Tyler contends that the fact that Dr. Theriot and Dr. Harrison were promoted under different deans and different chairs of the History Department is not legally relevant. In *Seay v. Tennessee Valley Authority*, the Sixth Circuit held that a plaintiff claiming racial discrimination was similarly situated to a non-protected employee even though the two individuals "worked in different ... departments and had different supervisors." 339 F.3d 454, 479 (6th Cir.2003). Even if the Court accepts that it is legally irrelevant whether Dr. Theriot and Dr. Harrison were promoted under different deans and different chairs, Dr. Tyler has not persuaded the Court that it applied a clear error of law or manifest injustice in its determination that the distance in time in the promotions of Dr. Theriot and Dr. Harrison and the different areas of performance are legally relevant and warrant a finding that the promotions of Dr. Theriot and Dr. Harrison are not similarly situated to that of Dr. Tyler.

Dr. Tyler also relies on the Supreme Court's decision in *International Brotherhood of Teamsters v. United States* to argue that the statistical evidence he offers is enough alone to prove discrimination. 431 U.S. 324 (1977). Dr. Tyler appears to be making a new argument based on statistical evidence he submitted with his response to Defendant's motion for summary

judgment. While the Court recognizes the statistical evidence submitted by Dr. Tyler, it also notes that Dr. Tyler failed to discuss the evidence in its memorandum in response to Defendants' motion for summary judgment. The Court reminds Dr. Tyler that a Rule 59(e) motion to alter does not provide a plaintiff an additional opportunity in which to argue the merits of his case. However, even if the Court were to consider this statistical evidence, it would not find in Dr. Tyler's favor.

Dr. Tyler submitted evidence showing that all of the full professors, past and present, in the University's History Department are white. Dr. Tyler is correct that the Supreme Court stated in *International Brotherhood* that "[s]tatistics are equally competent in proving employment discrimination." *Id.* at 339. However, the Supreme Court went on to explain that the usefulness of statistics "depends on the all of the surrounding facts and circumstances." *Id.* In particular, the Court noted that "[c]onsiderations such as small sample size may, of course, detract from the value of such evidence, and evidence showing that the figures for the general population might not accurately reflect the pool of qualified job applicants would also be relevant." *Id.* at 339 n.20 (internal citations omitted). The statistics provided by Dr. Tyler's are not useful in this case because they do not demonstrate the promotion of similarly situated non-protected professors. In fact, the "statistics" provided by Dr. Tyler are merely a breakdown of the racial composition of the past and present History Department. No statistical analysis is provided or data demonstrating the usefulness of this information. This is not the type of statistical evidence relied on by the Court in *International Brotherhood*. Therefore, the Court cannot rely on this evidence to conclude that Dr. Tyler has met his burden of demonstrating discrimination.

For these reasons, the Court finds that it did not commit clear error of law or manifest injustice when it held that Defendants were entitled to summary judgment on Dr. Tyler's disparate treatment claim under Title VII and KRS 344.040.

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Alter, Amend, and Vacate is **DENIED**.